Kenneth Covell
LAW OFFICE OF KENNETH COVELL
712 Eighth Avenue
Fairbanks, AK 99701
Phone: (907) 452-4377
Fax:    (907) 451-7802
E-mail: kcovell@gci.net

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA AT FAIRBANKS

| | |
|---|---|
| ELLIE G. AND SANDRA C. GRISSOM, and others similarly situated,  Plaintiffs,  vs.  FAMILY CENTERED SERVICES OF ALASKA, INC. and DOES I to X, (Managerial Employees Jointly Liable)  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>.)<br>) |

Case No. 4:07-cv-00030-RRB

## DECLARATION BY SANDRA GRISSOM

I, SANDRA C. GRISSOM, declare and state that:

1) I am an adult resident of the State of Alaska, fully competent to testify and I testify about the following facts upon my personal knowledge.

2) I was employed as a "houseparent" by Defendant Family Centered Services of Alaska, Inc. (hereafter FCSA).

3)  FCSA received more than 50% of its income from this service, *to wit,* Medicaid payments. I have examined the 2005 Annual Report and find on the page 15 pie chart that demonstrates this at page 15 where it says that 66% of FCSA the revenues came from Medicaid. (Exh. 1).

4)  My husband and I filled out the med / billing notes from which the billing to Medicaid was derived. There was a Quality Assurance program to be certain our med notes were correctly worded and would qualify for Medicaid reimbursement. It was strongly emphasized that we needed to bill in accordance with Medicaid requirements so that the FCSA could get paid. We also were continuously reminded that certain actions were covered by Medicaid and certain other actions were not. We were expected to differentiate these actions in the notes and instructed to maximize the billing to Medicaid whenever possible.

5)  When picking up medications we could tell if it was Medicaid paid because all that was needed was your signature to show you picked the medication up. We also knew which child had personal insurance because the procedure for picking up medications differed. I also knew which clients had Medicaid because after I became a house manager and worked in the office, I had to make sure to get renewals when they expired. In order for the child to receive his or her medications, he or she, needed a Medicaid sticker. Most clients came in with current Medicaid stickers and others I had to go to the state building and pick these up. I did this as a houseparent and a house manager.

6) The individual residents were either referred by a psychiatrist, psychologist, or physician and seen for evaluation by one of these classes of people, shortly after their arrival. As a houseparent, I was required to attend these meetings called "intake". As a house manager, I set up and facilitated these meetings. Often the child would have been referred by North Star Behavioral Center in Anchorage as well as from institutions in the lower 48. These are lockdown psychiatric hospitals where all the patients are being treated by a full battery of psychotherapists, including psychiatrists and psychologists. I could tell this because these providers' notes were included in the medical record that I was expected to familiarize myself with as part of my job caring for the children referred. All of our clients came to us with a referral but still saw our psychological professionals, including clinicians who might or might not be psychologists, a psychologist, when required, a psychiatrist and a medical doctor who would examine and test the new entry shortly after arrival and who jointly reach a conclusion about the care and procedures to apply to benefit the patient's medical and physiological conditions, *to wit*, mental illnesses or emotional disturbances, however you want to say it.

7) On page three of the TFH policy and procedure manual, under client profile, it says 1) All children admitted to the program will require stabilization for actions that are the result of mental illness, and/or behavior disorders. 2) Have been determined through clinical assessment to be suffering from a mental illness not of an organic origin. 3) be in imminent need of placement in a mental health treatment

facility.[1] 4) Have been determined by the the TFH admission review that placement would be beneficial for the child's stabilization, and/or reduction or resolution of their mental illness. (TFH Policy and Procedure Manual, Exhibit 2, page 3)

8) FCSA's lawyers keep saying that a "Clinician" saw these kids and evaluated them, and not a psychiatrist, psychologist or physician. What qualifications does the "clinician" have? Typically a clinician was a psychologist or a Licensed Clinical Social Worker. Every client saw Dr. Dean Ackley who was a contracted psychiatrist if they were on medication when they came to us or if the clinician thought they needed to be on medication. They would then be seen monthly for med checks and well being. The team relied heavily on the transferred medical records and psychological history as provided by the institution where the child was placed before being accepted at FCSA. I know this because I was expected to read these medical and psychological records as part of my duties as a therapeutic houseparent. The treatment team is composed of the coordinator, guardian *ad litem*, at least one biological parent if available, house parents, the clinician (psychologist or Licensed Clinical Social Worker), psychiatrist and a psychologist when needed, who would provide information to the treatment team. Consequently, the former treating psychologist and/or psychiatrist at the former treating institution was the usual route of referral and evaluation. I know this because as a house manager and as part of my job I was expected to examine and respond to all records for my clients.

---

[1] All of my clients had come from a lockdown psychiatric facility except for one.

9) In the event that the referral was not from a psychiatric institution our treatment team reviewed all available medical and psychiatric material available. That team included a psychiatrist and a outside psychologist when required to advise the team. I know these things because I was part of the team as well as a house manager and expected to be intimately familiar with the history of the client as reflected in the materials gathered or created on site.

10) Some of the residents were Alaska children transferred from non-Alaskan institutions. Some of our clients knew each other from being in treatment centers together from other non-Alaskan institutions. I know this because they would tell me and frequently recognized each other and would even talk about knowing former clients. It was part of my job to listen to our patients and know about their lives.

11) The clients were all SED and/or mentally ill. Many, or most of these children were referred from an inpatient psychiatric hospital and have been assigned an AXIS I clinical condition, or an AXIS II personality disorder. Most had multiple diagnoses. The children have been classified as severely affected by the diagnosed mental disorder and their functioning is severely impacted. I know this because I observed the medical records of the patients as part of my duties and observed that the children exhibited severe psychological dysfunction which was the reason they were placed with us.   We were the alternative to in-patient psychiatric hospitalization for the child. Some were not able to adjust to the program and would be sent back to other non-Alaskan institutes.

12) The primary reason FCSA exists is to care for SED children. SED is described as a child with a GAF (Global Assessment Functioning Scale) of 50 or below. One need only examine the questionnaire given to some potential employees to see that SED children were the focus of FCSA. (Grimes Questionnaire, Exhibit 3) All of our clients were SED/mentally ill. We were trained specifically to deal with SED children AND mentally ill children. We have read the 2005 Annual Report where on page 9 it says that the Therapeutic Family Homes exist to provide care to children experiencing mental health and behavioral issues and are at imminent risk of psychiatric placement elsewhere. (2005 Annual Report at 9, Exhibit 4)

13) At the time of my employment as a therapeutic houseparent, the position was classified as an exempt position. The first year of my employment, October 31, 2005 – October 31, 2006, we should have had 96 days off. We had 30. We had no youth counselor to help out. At one point, I was so wore out that I took all five of our clients to the main office and left them with the assistant director Ken Roberts after being told I could not have a day off after working 3 months without any relief. I left at 5:00 pm and returned at midnight. I asked for compensation of leave time in our leave bank or pay and was told by Christy Folsom, Ken Roberts, and Susanne Dale that the position was exempt and that time off would not be compensated.

14) . In order for our clients to be properly cared for according to policy and procedure, and to give my husband help, I never worked less than 50-60 hours per week. It took both of us to create the family atmosphere of a two parent home. I

was never compensated for anything over 40 hours per week regardless of how much time I put in or turned in on my time sheet. I was told not to put anything over 40 hours on my time sheet because I would not be paid for it. (Exh. 4, 5 and 6)

## Declaration

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on July 17, 2008.          _Sandra Grissom_
                                        Sandra Grissom

# ANNUAL REPORT 2005

# Family Centered Services of Alaska



**Family Centered Services of Alaska**
620 5th Avenue, 2nd Floor
Fairbanks, AK 99701-4512
(907) 474-0890
cmassingill@familycenteredservices.com

Exhibit ____ page ____ of ____

*Our Mission is to Serve Alaska by Providing Family and Child Centered Services with Unconditional Care*



FCSA Board of Directors

Pictured left to right: Deborah L. Coxon, President; Andre' Layral, Vice President; Charlie Sparks, Treasurer; Cathy Albright, Secretary; Cory Borgeson, Member.

| Table of Contents | |
|---|---|
| Letter from Executive Director | 3 |
| FCSA History | 4 |
| Management | 4 |
| FCSA Programs | 6 |
| New and Future Projects | 11 |
| FCSA Morale | 13 |
| Finances | 15 |
| Organizational Chart | 16 |

The 2005 Annual Report was authored, compiled, and edited by John W. Regitano, Amelia Ruerup, Eric Higginbotham, Suszan Dale, Kathy Cannone and Cindy M. Massingill.

2

Exhibit 1  page 2 of 16

## *Letter from the Executive Director and Board President*

Dear Readers:

We are proud to report that during Fiscal Year 2005 Family Centered Services of Alaska (FCSA) continued to meet and exceed client service expectations, by providing unparalleled services to Alaskan children and their families. After sixteen years of operation, FCSA continues to be a healthy, fiscally sound, and well-managed organization committed to providing care to children and families residing not only in Interior and Northern Alaska but for the entire state. During the year, FCSA continued to operate a variety of well-established programs and significantly expand new programs and services to meet our client's needs.

Within our area of expertise, FCSA continued to be an innovator in the development of new ways to address some of the many unmet needs of mental health consumers in Alaska in a cost effective quality manner. To help achieve the changes FCSA took a leadership role in working collaboratively with local, state and community agencies, to develop a network of services beyond our agency and help prevent the duplication of services. This current year FCSA took the initiative to expand the number of residential beds available for children to help prevent them from leaving Alaska to receive service and because of those efforts we were able to double the number of beds available for children in the community of Fairbanks. This year again we were able to add qualified professional staff members dedicated to the delivery of individualized services to severely emotionally disturbed children. These staff assist the children in developing functional social and life skills resulting in a much higher likelihood of maintaining healthy relationships and living meaningful independent lives.

FCSA is proud of our history of delivering individualized services that take into account the client as a whole person and well-being of the family. The unmet service needs of those children and families we provide service to continue to remain paramount in all managerial decisions. We are pleased and excited with our achievements during Fiscal Year 2005 and look forward to providing Alaskans with quality services for many years to come.

Sincerely,

John W. Regitano
Executive Director

Deborah L. Coxon
Board President

3