John Foster Wallace
McCONAHY, ZIMMERMAN & WALLACE
711 Gaffney Road, Suite 202
Fairbanks, AK  99701
(907) 452-2211
(907) 456-1137 facsimile
foster@mzwlaw.com

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT FAIRBANKS

| | |
|---|---|
| ROBERT PROBERT and LORETTA E. PROBERT, and others similarly situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>FAMILY CENTERED SERVICES OF ALASKA, INC. )<br><br>Defendants. ) | |

Case No.:  4:07-CV-00030 RRB

**OPPOSITION TO PLAINTIFFS' SECOND MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Family Centered Services of Alaska, Inc. ("FCSA") opposes the plaintiffs' second

motion for partial summary judgment.

The plaintiffs' second motion for partial summary judgment is nearly identical to their

first motion for partial summary judgment filed on December 27, 2007.  The plaintiffs have

produced no new evidence entitling them to summary judgment.[1]  On September 12, 2008, this

---

[1] The only new evidence produced by plaintiffs is Exhibit "1", FCSA's "Announcements" dated October 28, 2008. All other exhibits were provided to this Court in support of plaintiffs' first motion for partial summary judgment or their Reply to FCSA's opposition to their first motion for partial summary judgment.  In Exhibit "1", FCSA announced that: "FCSA started construction of three (3) Therapeutic Family Homes (TFH) the spring of 2008 in the Fairbanks area. It is anticipated that these group homes will be completed by the fall of 2008. The TFH's are designed to provide services for up to five (5) youth per home and the care and oversight is provided by Therapeutic

Court denied plaintiffs' first motion for partial summary judgment, finding that: "[T]he mental status of the children housed in FCSA's family homes is a genuine issue of material fact. The Court cannot determine if the FLSA applies to this matter absent clear resolution of this issue. The record before the Court is, at best, contradictory." The plaintiffs have given this Court no reason for ruling any differently.

In their first motion for partial summary judgment, plaintiffs argued that FCSA was an institution primarily engaged in the care of the mentally ill, defective, or infirm under 29 U.S.C. § 203(r), 29 C.F.R. § 779.21 and the Department of Labor's Field Operations Handbook (FOH) §§ 12g02, 12g12. *See* plaintiffs' first motion for partial summary judgment, pp. 5, 8, 9-10 and reply to opposition to first motion for partial summary judgment, pp. 2-5, 8-10, 12, 24. Plaintiffs now argue that even if the children residing in Therapeutic Family Homes were not mentally ill, they were sick, defective, or in need of care "in some way", "because of any infirmity." *See* Second Motion for Partial Summary Judgment, pp. 2-3, 7, 12. However, all of the children residing in the Therapeutic Family Homes were minors and, thus, because of their youth, necessarily required supervision and care in some way. The standard under the Federal Labor Standards Act ("FLSA") is whether FCSA's operation of its Therapeutic Family Homes constituted operating "an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective...." 29 U.S.C. § 203(r)(2), (s)(1)(B). The standard is not whether the

---

Parents." FCSA also announced that it had applied for funding to construct a Therapeutic Family Home in Dillingham, to be operated by the Bristol Bay Native Association and Bristol Bay Native Health Corporation. The statement cited by plaintiffs that FCSA "was rated number one this year by the State of Alaska, Department of Health Social Services who rated each of the 63 mental health treatment grantees in Alaska", referred to FCSA's mental health treatment programs in general, and not its Therapeutic Family Homes' program in particular. Exhibit "1" provides no new information bearing on the Therapeutic Family Homes' status under the Federal Labor Standards Act ("FLSA").

Therapeutic Family Homes provided care for children "in some way", because of "any infirmity".

## I.    Applicable Law Under the FLSA, C.F.R. and FOH.

The FLSA applies to the activities of an "enterprise" that are performed for a "business purpose" or in "operation of … an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution":

> (2) For purposes of paragraph (1), the activities performed by any person or persons—
> (A) in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is operated for profit or not for profit)….  29 U.S.C. § 203(r)(2).

29 U.S.C. § 203(s)(1)(B) similarly defines an "[e]nterprise engaged in commerce…" to include "an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution…."

Non-profit activities are not covered by the FLSA unless they were conducted for a "business purpose" or "are of the types which the last sentence of section 3(r) … declares shall be deemed to be performed for a business purpose" (i.e., institutions primarily caring for the sick, the aged, the mentally ill or defective):

> The activities described in section 3(r) are included in an enterprise only when they are performed for a "business" purpose. Activities of eleemosynary, religious, or educational organization may be performed for a business purpose. Thus, where such organizations engage in ordinary commercial activities, such as operating a printing and publishing plant, the business activities will be treated under the Act the same as when they are performed by the ordinary business enterprise. (See Mitchell v. Pilgrims Holiness Church Corp., 210 F. 2d 879 (CA-7); cert. den. 347 U.S. 1013.) However, **the nonprofit educational, religious, and eleemosynary activities will not be included in the enterprise unless they are of the types which the last sentence of section 3(r),** as amended in 1966,

**declares shall be deemed to be performed for a business purpose**. Such activities were not regarded as performed for a business purpose under the prior Act and are not so considered under the Act as it was amended in 1966 except for those activities listed in the last sentence of amended section 3(r).  29 C.F.R. § 779.214.  [Emphasis added].

The FOH provides the following definitions for application of 29 U.S.C. § 203(r)-(s):

12g02  <u>Institutions primarily engaged in the care of the sick, the aged, the mentally ill or defective residing on the premises defined.</u>
Such an institution (other than a hospital) is an institution **primarily** engaged in (i.e., more than 50% of the income is attributable to) providing domiciliary care to individuals who reside on the premises and who, if suffering from physical or mental infirmity or sickness of any kind, will require only general treatment or observation of a less critical nature than that provided by a hospital.[2]  Such institutions are not limited to nursing homes, whether licensed or not, but include those institutions generally known as nursing homes, rest homes, convalescent homes, homes for the elderly and infirm, and the like.  (See also FOH 25i and 12g12).  [Emphasis added].

\*                                    \*                                    \*

12g12  <u>Institutions for the residential care of emotionally disturbed persons.</u>
For enforcement purposes, a private institution for the residential care of emotionally disturbed persons would come within the coverage of Sec. 3(s)(5) of the Act if more than 50% of its residents have been admitted by a qualified physician, psychiatrist, or psychologist.  For purposes of the 50% test, the term "admitted" includes evaluations of mental or emotional disturbance by a qualified physician, psychiatrist, or psychologist either subsequent to admission to the institution or preceding admission and being the cause for referral.

12g14  <u>"Community living centers" and "halfway houses" for retarded persons.</u>
For enforcement purposes, a private institution for mentally retarded persons, sometimes called a "community living center" or a "halfway house", would come within the coverage of Sec. 3(s)(5) of the Act, if more than 50% of its residents have an IQ of 69 or less as determined on the basis of a valid test administered by a qualified professional, <u>and</u> a reasonable degree of "care" is being provided.  **An IQ of 69 or below is considered "mentally defective."**  "Care" may include such services as waking up residents in the morning to see that they get breakfast in time to leave for work, picking some up at night after work, special counseling, instruction in money management and health matters and generally keeping an eye on them and listening to problems.  (See also FOH 12g02 and 12g12).  [Emphasis added].

---

[2] The term "hospital" is defined at FOH § 12g01.

12g15  "Care" of the aged and infirm.
(a)  Many establishments variously referred to as "retirement hotels", "retirement apartments", "homes for …", "senior citizens retirement homes" and the like provide residences and other services for older persons.  In order to determine whether such an establishment may qualify as an "institution primarily engaged in the care of the … aged …" one of the key questions is whether "care" is provided.
(b)  The word "care" as it is used in Sec 3(s)(b) is subject to a broad interpretation and encompasses routine custodial services and attention.  Institutions which care for the aged, (as well as other institutions which care for the sick or the mentally ill or defective), can vary from extremely well-serviced establishments to those of a custodial type of servicing.    Where an establishment must take full responsibility of any nursing home or hospital care a resident requires, this constitutes "care" of the resident.  However, it does not necessarily follow that to be a home for the aged, the establishment must be a nursing home or otherwise medically oriented.  If the aged occupants, in addition to receiving food, shelter, and laundry, must be closely watched because their senile condition necessitates their being supervised and guided, even though they receive no medical attention, they may, depending upon all the facts, be receiving "care" for the aged within the meaning of Sec 3(s)(5).  (See also FOH 12g02, 12g12, 12g14.)
(c)   On the other hand, some apartment hotels and retirement homes that cater to retirees and other elderly persons who are completely ambulatory and in reasonably good health are not considered institutions primarily engaged in the care of the aged who reside on the premises.  Even though such an establishment may furnish certain special services, as for example, emergency pull bells in the bathroom connected to a public address system in the office and a registered nurse on duty for an hour each day to aid tenants if they need help in taking required medication, these services may, depending upon all the facts, be just a part of a deluxe service furnished by the establishment and such establishments would not be covered under Sec 3(s)(5).

\*                                         \*                                      \*

12g18  Institutions for neglected and dependent children.
Private nonprofit institutions providing care for neglected and dependent children are not covered by the enterprise provisions of the FLSA, provided that such institution is not operated in conjunction with a hospital, covered institution, or school within the meaning of Secs 3(r) and 3(s) of the Act.  However, there may be employees who are covered on an "individual" bases.

The only pertinent provision of the FOH addressing children specifically provides that a nonprofit organization's "care" of "neglected and dependent children" is not covered by the FLSA, unless it is a hospital, covered institution, or school under 29 U.S.C. § 203(r)-(s).  FOH §12g18.  This defeats plaintiffs' argument that a residential facility providing care for children

"in some way" is within 29 U.S.C. § 203(r)-(s), based solely upon the provision of such care. Once more, children with emotional and behavioral problems who are not mentally ill[3], are not "sick" or "defective" for 29 U.S.C. § 203(r)-(s).  The term "mentally defective" is defined as having an "IQ of 69 or below."  FOH §12g14.  In <u>Brennan v. Harrison County</u>, 505 F.2d 901, 906 (5th Cir. 1975), the court equated "a home for the sick" to a "nursing home" for 29 U.S.C. § 203(r)-(s).  According to Black's Law Dictionary (4th Ed.), "sick" means "Affected with disease, ill, indisposed."  There is no evidence that any child residing in a Therapeutic Family Home was diseased, ill, indisposed, or had an IQ of 69 or less.  Indeed, nearly all of the children attended regular public schools, rode public school buses, and participated in after-school activities and community functions.  *See* Second Affidavit of John Regitano filed on September 5, 2008, p. 4; and Affidavit of John Regitano filed on February 11, 2008, p. 2.  29 U.S.C. § 203(r)-(s) uses precise language in extending coverage only to "institutions" primarily engaged in caring for the "sick, the aged, the mentally ill or defective."  It does not encompass children needing "care in some way", because of "any infirmity.  "…[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  [Citing <u>Camacho v. Bridgeport Fin., Inc.</u>, 430 F.3d 1078, 1081 (9th Cir. 2005) (quoting <u>Russello *v. United States*</u>, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983)) and <u>Silvers v. Sony Pictures Entm't</u>, 402 F.3d 881, 885 (9th Cir. 2005)].  <u>United States v. Fuller</u>, 531 F.3d 1020,

---

[3] Plaintiffs base their second motion for summary judgment on the premise that the children were sick or defective, even if they were not mentally ill.  Under state law, "mental illness" is defined as: "an organic, mental, or emotional impairment that has substantial adverse effects on an individual's ability to exercise conscious control of the individual's actions or ability to perceive reality or to reason or understand; mental retardation, epilepsy, drug addiction, and alcoholism do not per se constitute mental illness, although persons suffering from these conditions may also be suffering from mental illness."  AS 47.30.915(12).  The children residing in Therapeutic Family Homes were not "mentally ill" under AS 47.30.915(12).  *See* Second Affidavit of John Regitano, filed on September 5, 2008.

1027 (9th Cir. 2008). "The doctrine of *expressio unius est exclusio alterius* as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." Id. ." "It is a well-established principle of statutory construction (and of common sense) that when … 'two words or expressions are coupled together, one of which generically includes the other, it is obvious that the more general term is used in a meaning excluding the specific one.'" [Citing J. Sutherland, Statutes and Statutory Construction, § 266**,** p. 349 (1891)]. City of Columbus v. Ours Garage & Wrecker Serv., 536 U.S. 424, 445 (2002) (dissenting opinion of Justice Scalia, joined by Justice O'Connor).

Under FOH §12g12, institutions providing residential care to emotionally disturbed persons may be within 29 U.S.C. § 203(r)-(s) if more than 50 percent of the residents were admitted by a "qualified physician, psychiatrist, or psychologist", or was evaluated by a "qualified physician, psychiatrist, or psychologist" and the evaluation was the "cause of the referral." Kitchings v. Florida United Methodist Children's Home, 393 F.Supp.2d 1282, 1292, fn. 25 (D.Fla. 2005). As the majority of children were not admitted by a "qualified physician, psychiatrist, or psychologist" or evaluated by a "qualified physician, psychiatrist, or psychologist" as the cause of referral to a Therapeutic Family Home, the Therapeutic Family Homes are not covered under FOH §12g12. *See* Second Affidavit of Regitano filed on September 5, 2008, pp. 2-4, and Affidavit of Regitano filed on February 11, 2008, pp. 4-5. Only after, and if, it is determined that an institution is engaged in the care of "the sick, the aged, the mentally ill or defective", then may it be determined whether the institution was so "primarily engaged" under FOH §12g02. Although "domiciliary care" consisting of "only general treatment or observation of a less critical nature than that provided by a hospital" may be

considered to determine whether the institution was "primarily engaged", it must first be determined that its residents were """the sick, the aged, the mentally ill or defective."  FOH §12g02.  As the Therapeutic Family Homes was not an "institution" caring for "the sick, the aged, the mentally ill or defective", FOH §12g02 does not apply to determine whether it was so "primarily engaged."  The receipt of Medicaid payments does not establish that the children were "sick" or "mentally ill or defective" or that the Therapeutic Family Homes was an "institution" caring for "the sick, … or the mentally ill or defective" under 29 U.S.C. § 203(r)-(s).  Kitchings, supra, p. 1290.

Finally, the FLSA, regulations, and FOH do not define the term "institution".  However, federal regulations define "institution for mental diseases" for Medicaid as:

> Institution for mental diseases means a hospital, nursing facility, or other institution of more than 16 beds that is primarily engaged in providing diagnosis, treatment or care of persons with mental diseases, including medical attention, nursing care and related services. Whether an institution is an institution for mental diseases is determined by its overall character as that of a facility established and maintained primarily for the care and treatment of individuals with mental diseases, whether or not it is licensed as such. An institution for the mentally retarded is not an institution for mental diseases. 42 C.F.R. § 435.1009.

As the Therapeutic Family Home accommodated no more than five children, it was not an "institution for mental diseases" under federal law.  42 C.F.R. § 435.1009.

## II.    Judicial Interpretation.

The language of the FLSA, and the court's interpretation thereof, predominate over the Department of Labor's interpretations set forth in the regulations (C.F.R.) and its FOH.  29 C.F.R. §§ 779.7 – 779.8.  "The ultimate decisions on interpretations of the Act are made by the courts…."  29 C.F.R. § 779.8.

Courts considering nonprofit therapeutic homes providing residential care to children with emotional and behavioral problems have held that they were not institutions within the

meaning of 29 U.S.C. § 203(r)-(s).  In Bowrin v. Catholic Guardian Society, 417 F.Supp.2d 449 (SDNY 2006), the court distinguished residential group homes for children with emotional and behavioral problems from residential institutions treating severe mental illnesses or mental retardation.   The court considered only the particular type of homes at issue, rejecting the argument that it must consider all of the non-profit's programs in determining whether the FLSA applied.  Id., pp. 460, 464-465.

> …[T]he court … did not address the issue presented in this case, that is, whether services that are performed without a business purpose (foster care) are related to, and part of a single enterprise with, services that are performed for a business purpose (the care of the mentally ill).  The DOL Regulations make clear that they are not:
>
> Activities … are included in an enterprise only when they are performed for a "business purpose"….   Nonprofit educational, religious, and eleemosynary activities will not be included in the enterprise unless they are the types which section 3(r) … declares shall be deemed to be performed for a business purpose.
>
> Consequently, many of CGS's activities are not covered by the Act.  Indeed, all services other than the MRDD and ACT programs are not performed for a statutorily recognized business purpose and are not deemed to be related activities.  See 29 C.F.R. § 779.211 ("Activities which are not related … are not included as part of the enterprise.").
>
> For similar reasons, CGS, as a single entity, does not have a "common business purpose" necessary to establish an enterprise under the third prong of the statutory test. Plaintiff implicitly recognizes this failing when it argues that the test is met because CGS admits that its "common purpose . . . is serving children, families and people with retardation, helping people in their time of need." … Of course, what is required is not a common purpose but a common business purpose. See 29 U.S.C. §§ 203(r)(1)-(2). None of CGS's activities are performed for-profit. Therefore, only those activities that are specified in Section 3(r)(2)(A) are recognized as "for a business purpose" for purposes of defining an enterprise. 29 U.S.C. § 203(r)(2)(A). The vast majority of CGS's activities and programs are conducted for the sole purpose of providing services and/or care to neglected children, and are not considered by Congress to be performed for a business purpose. Consequently, the constituent parts of CGS, while surely having some common purpose, cannot be said to have a common business purpose that would warrant finding CGS to be a single enterprise under the Act.  Id., pp. 464-465.

> Plaintiff alternately contends that the care of the mentally retarded (through MRDD) and the care of neglected youth (through Congregate Care) constitute a "common business purpose." … This definition, while narrower, is equally flawed since the care of neglected youth is not a business purpose under § 203(r), thereby precluding it from being part of a purported common business purpose to "serve" children. Id., fn. 5.

The court held that FLSA applied to the nonprofits' "Assertive Community Treatment" ("ACT") residential facilities that provided services "equivalent" to a "hospital's comprehensive services" for treating severe mental illnesses and to its "Mental Retardation and Developmental Disabilities" ("MRDD") residential facilities for mentally retarded adolescents and adults. Id., pp. 452, 460-464. However, the FLSA did not apply to its group homes providing therapeutic services to emotionally and behaviorally troubled children that were not treated for severe mental illnesses. Id., pp. 465, 469-471. In determining FLSA coverage, the court considered the severity of the mental illnesses and the quantity and quality of treatment provided by the facilities. Group homes were not within 29 U.S.C. 203(r)-(s) where they were staffed with child care and social workers and the children attended school, even though therapy was provided:

> CGS's three regular group homes are designated for abused and neglected children that ACS has determined "cannot function in a family setting safely or appropriately, and … require residential placement where they can be observed and monitored and put through structured behavior modification systems in order to correct their behavior…." As of March 2005, the approximate number of children residing in CGS's three regular group homes was twenty-two…. There are thirty-two total available beds…. The regular group homes are permanently staffed by group home supervisors and child care workers, and periodically staffed with a substance abuse counselor, an applied behavior scientist, a case worker, a social worker supervisor, and a part-time registered nurse…. Defendant does not dispute there is a therapeutic element to services provided in the regular group homes…. The responsibilities of child care workers generally include ensuring school attendance, administration of medication, transportation to activities, such as recreation, visits with biological and foster care families, reviews with ACS, and medical appointments….. Child care workers are also responsible for cleaning and securing the home, and purchasing and providing for the daily necessities of the residents…. None of the Congregate Care staff receive an overtime premium for hours worked in excess of forty in a week…. Id., p. 454.

In contrast, ACT homes were "designed to 'deliver the equivalent of the hospital's comprehensive services directly" to "severely mentally ill" children who could not be cared for in the non-ACT group homes, and were staffed with psychiatrists and psychologists. Id., pp. 454-455, 474.

> ACT and RA group homes are designed for residents with "behaviors that are typically not able to be cared for in a regular group home program or in a foster family program." … These facilities "have more staffing [and] more clinical staff than regular group home[s] to support in the treatment plan of the resident…." ACT and RA homes staff psychiatrists, psychologists, social workers, RNs, and individual group and family therapists who monitor residents' mental health status…. When ACS refers a child to an ACT group home, the referral includes a plan placement package that indicates what kind of diagnosis, if any, the child has…. In most cases children referred to the Hard-to-Place homes have some type of psychological, medical, or behavioral diagnosis….
>
> According to Longley's original deposition testimony, ACT group homes are "specifically geared to care for children with severe mental illness.…" Longley also testified that with the ACT program, CGS "specifically sought to care for a severely mentally ill population. And that's our intent." … In addition to children with severe mental illness, CGS will accept into ACT homes some children designated by ACS as Hard-to-Place but not necessarily mentally ill…. A child might be considered Hard-to-Place because of "a history of AWOL behavior, conduct disorder, [or] criminal behaviors…." Longley wrote the staff manual for the ACT program…. The manual states that the "ACT Program is intended to be a community-based alternative to the hospital, delivering the equivalent of the hospital's comprehensive services directly to the adolescent in the community…." The ACT program was developed in part to respond to a growing need in the New York City foster care system for "children with severe mental illness and moderate behavioral health conditions," following the trend of deinstitutionalizing the mentally ill in the 1950s…. Id., pp. 454-455.

The court granted summary judgment, finding that the ACT homes were covered by the FLSA, but that the non-ACT homes were not covered. Id., pp. 464, 469-471.

Bowrin is consistent with Kitchings v. Florida United Methodist Children's Home, supra, where the court granted summary judgment, holding that a residential children's home providing

therapeutic services to emotionally damaged children was not an institution under 29 U.S.C. § 203(r)-(s).  As the court described the residential home:

> The Children's Home is a religious not-for-profit organization dedicated to providing residential care and treatment for children between the ages of 5 and 18 who have been abused, neglected, or otherwise subjected to emotional damage…. These are children who are unable to remain in their original homes due to emotional conflicts, adjustment problems, relationship disturbances, developmental delays, and issues associated with sexual, physical and emotional abuse…. The Children's Home is licensed to care for as many as eighty-eight children…. Id., p. 1285.

> \*                                 \*                                 \*

> Residents are cared for using the "house parent model…." The Children's Home has eleven cottages, each of which houses eight to ten Residents in age appropriate settings, under the supervision and care of a married couple acting as "houseparents."…. Houseparents model family life, and support the Residents' development of meaningful relationships…. Houseparents act in loco parentis, and provide a nurturing environment by playing a central role in all home, campus and extracurricular activities of the Residents in their care…. The houseparents provide transportation to school and extracurricular activities, provide for the Residents' nutritional needs, and ensure that the Residents' health needs are met…. The houseparents also participate in school and extracurricular activities, structure study time, and may attend parent-teacher conferences…. They also provide feedback to each Resident's therapist and caregivers regarding the effectiveness of the Resident's treatment plan….

> …Houseparents perform most of the cooking and participate in "general clean up…."The Residents perform a variety of chores, including vacuuming and cleaning the general areas of the home, washing dishes, weeding, washing the cottage's vehicle, and taking out the trash…. Houseparents may assist with laundry and in carrying groceries…. However, most of their work is related to delivering the Children's Home's services via the house parent model…. While the Residents are at school or otherwise away from the Children's Home, houseparents are free to leave and to attend to personal matters, provided that their work is done…. Houseparents get at least five hours of sleep per night, and usually get between six and eight hours of sleep.... Id., pp. 1285-1287.

> \*                                 \*                                 \*

> Children who are residents of the Children's Home ("Residents") come from the state of Florida, through both state placement, and, to a lesser extent, from private placement…. Children are placed via private placement when their parents or legal guardians are unable or unwilling to raise them, and this inability to reside

with their natural parents or guardians is the primary reason for placement at the Children's Home…. Those children placed by the state are children that have been abandoned, are state-dependent, or are pre-delinquent…. Children placed by the state are actually placed by "community based care," from community-based agencies that cover specific geographic areas…. These agencies are private agencies that have contracts with the state to provide services and care to children in their area…. Thus, when a child is in need, the agency might refer that child to the Children's Home. Approximately fifty percent of the Residents are referred from community-based care…. Id., pp. 1285.

The court described the services provided by the home:

The Children's Home is not licensed as either a hospital or a mental care facility, and Residents are not admitted on the basis of mental health issues…. The primary reason for placement is that the child is unable to reside with their natural parents or guardians…. Most of the Residents, however, do have some form of psychological disorder, and many are on some form of medication…. If a child has a serious disorder, he or she will not be accepted for residency because the Children's Home is not equipped to deal with those children…. The stated goal of the Children's Home is "to heal the physical, emotional, and spiritual trauma of its residents…." Thus, the Children's Home provides basic residential care, including food, clothing, shelter, and basic medical treatment, as well as psychological counseling and therapy, recreational and music therapy, tutoring, vocational instruction, and religious education.

Each Resident is assigned to both a Child and Family Therapist and to a Treatment Team, which Team includes the assigned houseparents…. The Therapist and Treatment Team develop an Individual Treatment Plan for each Resident that establishes certain goals and objectives designed to overcome each Resident's past problems and to return the Resident to family life….

The Children's Home has a psychiatrist on contract to oversee case functions…. In addition, the Children's Home has one therapist for each cottage, each of whom are licensed as mental health professionals…. The Children's Home also has therapists with masters degrees in social work, and a part-time behavioral analyst…. The Director of Admissions and his assistant are both mental health professionals…. Finally, the Children's Home has a nurse with a certificate in substance abuse, who performs work in that area…. Id., pp. 1288.

The court recognized the home's psychiatric aspects:

The Children's Home (Florida United Methodist Children's Home, Inc.) has licenses from the state to operate a residential group care facility, to provide foster care, adoption services, and a day care…. To have a license for residential care, the Children's Home needs contracts with medical personnel and with a

psychiatrist, particularly with regard to the distribution of medication…. <u>Id</u>., fn. 11.

\*                                        \*                                        \*

Dr. Bruce Henry states that most of the residents are admitted due to their behavior, usually based on a psychiatric disorder…. <u>Id</u>., fn. 12.

\*                                        \*                                        \*

Conditions the Residents have include attention deficit disorders, poor impulse control, defiant behavior, dysthymic disorder, post-traumatic stress disorder, and mild conduct disorder…. Dr. Bruce Henry, a psychiatrist on contract with the Children's Home, indicates that at admission, approximately eighty percent of the Residents have some form of disorder…. <u>Id</u>., fn. 13.

\*                                        \*                                        \*

One difference between the Children's Home and other residential programs, such as "Devereux," is that children with severe psychological problems go to programs other than the Children's Home, which programs offer more hospital-based care, clinical care, and a more sterile and intensive ("lock-down") treatment environment…. In contrast, at the Children's Home, Residents are taught common skills for getting along with each other, behavioral techniques such as how to control their behavior, and how to act appropriately…. Residents at the Children's Home require treatment or observation of a less critical nature than hospitals provide. <u>Id</u>., fn. 14.

\*                                        \*                                        \*

"Residential care combines components of holistic living for [the] kids, from learning behaviors as a family, eight kids to a cottage, two parents, to teach interactive skills between adults and kids, kids and kids, to build in social habits, positive behaviors, the whole learning involvement of how to live with others in a community, not just between one cottage but between groups of kids, so that they can have the skills to go out and live with smaller groups and smaller families." <u>Id</u>., fn. 15.

\*                                        \*                                        \*

The psychiatrist may evaluate the Residents prior to admission, but often the Residents arrive at the Children's Home with a psychological evaluation that was performed elsewhere. Id., fn. 18.

The home's funding included "Medicare payments for its behavioral services, which funding the Children's Home includes as part of 'state contracts,' because although Medicare funds are federal funds, they come to the Children's Home from the state…." Id., p. 1290. The court distinguished "between the Children's Home and other residential programs located in Florida, based on the types of disorders found among residents, the types of treatment and observation residents require, the care and treatment offered, and the licenses they have." Id., 1294. The court held that the home was not an institution under 29 U.S.C. § 203(r)-(s):

> In the instant case, the Defendant has pointed out facts showing that the Children's Home's primary purpose is not to treat the mentally ill, noting, for example: the Children's Home is not licensed as a mental hospital; the psychological therapy and counseling it offers are merely part of, or incidental to, its purpose of providing a home for dependant children and the ultimate goal of returning each Resident to family life in the community; the primary criteria for admission is the fact that a child cannot be raised by his or her natural parents or guardians, and is not necessarily related to the mental health of the child; and the fact that many Residents suffer from psychological and emotional problems is incidental to their status as neglected or dependent children…. These facts support the conclusion that, rather than being primarily engaged in treating the mentally ill, the Children's Home operates as a religion-based organization that takes a holistic approach to working with Residents in a variety of ways, and which provides many more services than merely psychological or psychiatric treatment.

> In support of their position, the Plaintiffs offer the conclusory assertions that in order to be paid for housing children in the care of the State, the Children's Home "must provide intense psychological and psychiatric care for the children," and the State sends children to the Children's Home "because it can provide psychological and psychiatric services…." The former statement is belied by the facts, and while the latter statement may be true, it does not demonstrate that the Children's Home is primarily engaged in treating the mentally ill. Id., pp. 1296-1297.

> *                          *                          *

> Additional facts are compelling in demonstrating that the Children's Home is not primarily engaged in the treatment of the mentally ill: the Children's Home is a religious, not-for-profit organization dedicated to providing residential care and treatment of children who have been abused, neglected, or otherwise subjected to severe emotional damage…; the Children's Home is not required to provide psychological counseling unless the initial treatment plan suggests that the

Resident needs to see a psychiatrist…; those Residents that do suffer from a mental disorder require only general treatment or observation of a less critical nature than in a hospital…; if a child has a serious psychological disorder, they will not be accepted for residency because the Children's Home is not equipped to help those children…; counseling is only part of the Children's Home's "holistic approach" to caring for the Residents, which also includes medical and health services, recreational therapy, music therapy, education and tutoring, vocational instruction, horticulture therapy, therapeutic work programs, and religious life and education…; the Children's Home's goal is to help the Residents grow, to develop emotionally, psychologically, behaviorally and spiritually, and to teach the Residents interacting skills, to build social habits, to teach positive behaviors, so the Residents can learn to live with others in a community, and so the Residents can gain skills to go out and live with smaller groups and smaller families…; and psychological care is only provided to some of the Residents…. Id., fn. 32.

In Joles v. Johnson County Service Bureau, 885 F.Supp. 1169, 1175 (S.D. Ind. 1995), the court considered a non-profit organization operating a group home whose "primary objectives" were to "provide temporary shelter and care to troubled youths … who are referred by juvenile courts or county residents, including welfare and probation departments." The court held that the home "did not qualify as any of the organizations or activities listed in 29 U.S.C. § 203(r)(2)":

Unless it engages in commercial activities in competition with private entrepreneurs or qualifies as one of the organizations listed in 29 U.S.C. § 203(r)(2), a non-profit charitable organization is not an "enterprise" under § 203(r) because it is not conducted for a "business purpose". So declares the Supreme Court, Tony and Susan Alamo Foundation v. Secretary of Labor, 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed. 2d 278 (1985), 29 C.F.R. § 779.214(1994); Wagner v. Salvation Army, 660 F.Supp. 466, 467 (E.D.Tenn., 1986); … and the legislative history of the Act, S.Rep. No. 1744, 86th Cong., 2nd Sess, 28 (1960). Unless one of the two circumstances obtain, non-profit eleemosynary organizations which provide shelter and care to troubled youth are not engaged in a "business purpose" under the Act. [Citing Segali v. Idaho Youth Ranch, 738 F.Supp. 1302 (D.Idaho. 1990)]. Id.

The Affidavits of John Regitano establish that FCSA's Therapeutic Family Homes provided residential care to children with emotional and behavioral problems similar to the care provided by the group homes in Kitchings and Joles and the non-ACT group homes in Bowrin. The Therapeutic Family Homes did not treat or care for children with severe mental illnesses.

Second Affidavit of Regitano, pp. 4-5; Affidavit of Regitano, pp. 6-7.  Rather, FCSA operated a separate residential program, its "Residential Diagnostic Treatment" facility ("RDT"), that provided intensive treatment and a restrictive environment to evaluate and treat children with serious mental illnesses (similar to the ACT homes in <u>Bowrin</u>).  Second Affidavit of Regitano, p. 5.  The Superior Court for the State of Alaska granted summary judgment for FCSA, holding that its Therapeutic Family Homes is not an institution under 29 U.S.C. § 203(r)-(s):

> Family Centered Services of Alaska, Inc. (FCS) is an Alaska nonprofit corporation which operates therapeutic family homes.  The homes are licensed by the State of Alaska Department of Health and Social Services, Office of Children's Services.  Each home has a "Community Care License" to operate as a "Residential Child Care Facility."  The homes are not licensed as mental institutions or residential psychiatric treatment centers.
> *                    *                    *
>
> FCS's family homes are designed to replicate the family experience.  FCS employs live-in therapeutic home parents who are responsible for the overall care and supervision of the children in the home and who are required to reside in and manage the daily operations of the home.  The job description of therapeutic home parent includes acting as a positive role model and taking responsibilities of the primary parents for all children placed in the home, inclusive of school meetings. Scheduling routine medical services and providing opportunities for involvement in cultural, religious and extracurricular activities.
>
> FCS's family home program provides residential care for children who are experiencing emotional and behavior problems and are at risk of placement in institutional facilities because they lack a safe and stable home environment, but not because they need or require institutionalization.  The primary purpose of the family home is to provide an alternative for these at-risk children to cope with their problems.  The ultimate goal of the family home is to transition the children back into a private home, a stable foster home, or possibly independent living when such an option become available.  The family homes are designed to replicate a family experience.  They are located in residential neighborhoods and appear, internally and externally, like private family residences.  The children attend public school and obtain medical treatment from local providers, physicians, and the hospital.  The children are encouraged to participate and attend after school activities, community functions, sporting events, and recreational outings such as fishing, bicycling, and going on walks.
>
> *                    *                    *

> …[T]he uncontradicted facts of the matter are that the FCS home that Powell was employed in was no more than a licensed residential child care facility that served as a home for needy children.  The purpose of the home was to provide a safe stable environment for its children; it is a home, not a treatment facility.  No stretch of the facts in this case can bring FCS within FLSA enterprise coverage. Id.

*See* State of Alaska, Superior Court for the State of Alaska, Fourth Judicial District, <u>Powell v. Family Centered Services of Alaska</u>, 4FA-06-2438Ci, Order Granting Summary Judgment and Dismissing Claims dated February 29, 2008, pp. 1-3, 6, attached here as Exhibit "A".

## CONCLUSION

29 U.S.C. § 203(r)-(s) does not cover nonprofit organizations providing care to neglected or dependent children.  FOH §12g18.  Under the FLSA, regulations, FOH, and case law, the children residing in Therapeutic Family Homes were not "the sick, the aged, the mentally ill or defective", and the Therapeutic Family Homes was not an "institution" primarily caring for "the sick, the aged, the mentally ill or defective."  The plaintiffs' second motion for summary judgment must be denied.

DATED at Fairbanks, Alaska, this 6th day of November, 2008.

McCONAHY, ZIMMERMAN & WALLACE
Attorneys for Defendants

By: /s/John Foster Wallace
    John Foster Wallace, ABA #9211115
    McCONAHY, ZIMMERMAN & WALLACE
    711 Gaffney Road, Suite 202
    Fairbanks, AK  99701
    (907) 452-2211
    (907) 456-1137 facsimile
    foster@mzwlaw.com

<u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the foregoing will be electronically served simultaneous with filing to the following attorneys and/or parties of record:

    Kenneth L. Covell
    Law Offices of Kenneth L. Covell
    kcovell@gci.net

/s/Sarah S. Haines           11/06/2008
Sarah S. Haines for McConahy, Zimmerman & Wallace