1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF ALASKA

3    ROBERT PROBERT and LORETTA      )   Case No. 4:07-cv-00030-RRB
     PROBERT,                        )
                                     )   Fairbanks, Alaska
4                  Plaintiffs,       )   Friday, January 9, 2009
                                     )   11:01 o'clock a.m.
5              vs.                   )
                                     )   **ORAL ARGUMENT ON SECOND**
6    FAMILY CENTERED SERVICES OF     )   **MOTION FOR PARTIAL SUMMARY**
     ALASKA, INC., JOHN W.           )   **JUDGMENT (DKT 53)**
7    REGITANO, KATHY CANNONE,        )
     SUSAN DALE, LONNIE HOVDE, and   )
8    DEBORAH L. COXON,               )
                                     )
9                  Defendants.       )
                                     )
10                                   )
     GENE GRISSOM, SANDRA GRISSOM,   )
11   DONNA GRIMES, JOHN GRIMES,      )
     LEONA MCDANIELS, KENNETH        )
12   MCDANIELS, ERIC CLONINGER,      )
     DEBRA CLONINGER, LORETTA REES,  )
     TIMOTHY DECKER, and CARLA       )
13   SMITH,                          )
                                     )
14        Intervenor Plaintiffs,     )
                                     )
15             vs.                   )
                                     )
16   FAMILY CENTERED SERVICES OF     )
     ALASKA, INC., JOHN W.           )
17   REGITANO, KATHY CANNONE,        )
     SUSAN DALE, LONNIE HOVDE, and   )
18   DEBORAH L. COXON,               )
                                     )
19        Intervenor Defendants.     )
                                     )

20                **TRANSCRIPT OF PROCEEDINGS**

21        BEFORE THE HONORABLE RALPH R. BEISTLINE
                UNITED STATES DISTRICT JUDGE

22

23

24

25

**NoDak Rose Transcripts**
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

```
 1     APPEARANCES:

 2     For the Plaintiffs and          KENNETH L. COVELL, ESQ.
          Intervenor Plaintiffs:       Law Offices of Kenneth L. Covell
 3          Grissom, Grimes,           712 8th Avenue
            McDaniels, Cloninger,      Fairbanks, Alaska    99701
 4          and Rees                   (907) 452-4377

 5                                      DONALD F. LOGAN, ESQ.
                                        Attorney at Law
 6                                      P.O. Box 73162
                                        Fairbanks, Alaska    99707
 7                                      (907) 590-4341

 8     For the Defendant:              JOHN FOSTER WALLACE, ESQ.
          Family Centered Services     CONNIE CATES RINGSTAD, ESQ.
 9          of Alaska, Inc.            McConahy, Zimmerman & Wallace
                                        711 Gaffney Road, Suite 202
                                        Fairbanks, Alaska    99701
10                                      (907) 452-2211

11                                      RICHARD D. MONKMAN, ESQ.
                                        Sonosky, Chambers, Sachse,
12                                       Miller & Munson, LLP (Anch.)
                                        900 West 5th Avenue, Suite 700
13                                      Anchorage, Alaska    99501
                                        (907) 586-5883
14
       For the Defendants and         JOHN FOSTER WALLACE, ESQ.
15        Intervenor Defendants:       CONNIE CATES RINGSTAD, ESQ.
            Regitano, Cannone,         McConahy, Zimmerman & Wallace
16          Dale, Hovde, and Coxon     711 Gaffney Road, Suite 202
                                        Fairbanks, Alaska    99701
17                                      (907) 452-2211

       Court Recorder:                 LYNN GROVES-KELLEY
18                                      U.S. District Court
                                        101 12th Avenue, Room 229
19                                      Fairbanks, Alaska    99701
                                        (907) 451-5792
20
       Transcription Service:          NODAK ROSE TRANSCRIPTS
21                                      721 North 19th Street
                                        Bismarck, North Dakota   58501
22                                      (701) 255-1054

23     Proceedings recorded by electronic sound recording.
       Transcript produced by transcription service.
24

25
```

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota    58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 2 of 33**

1    FAIRBANKS, ALASKA - FRIDAY, JANUARY 9, 2009

2    (Call to Order of the Court at 11:01 a.m.)

3    THE CLERK:  All rise.  His Honor the Court, the

4  United States District Court for the District of Alaska is now

5  in session, the Honorable Ralph R. Beistline presiding.  Please

6  be seated.

7    THE COURT:  Good morning.

8    MR. LOGAN:  Good morning, Judge Beistline.

9    MR. WALLACE:  Good morning.

10    THE COURT:  So, nothing else to do in Fairbanks

11  today, huh, but come here?

12    MR. LOGAN:  Staying here just for you.  I'm leaving

13  at eight o'clock tonight for the warm weather.

14    THE COURT:  Okay.  What is the lighting?  What's --

15  what's this lighting, just to add to the --

16    MR. LOGAN:  The ambiance.

17    THE COURT:  Okay.  Well, I appreciate that.  The

18  question we're -- it's <u>Probert, et. al. v. Family Centered</u>

19  <u>Services</u>, 4-7-30.  Question is do the overtime provisions of

20  the 1938 Fair Labor Standards Act apply to employers of Family

21  Centered Services of Alaska?  Plaintiffs say yes, defendant

22  says no.  What's the answer?

23    MR. LOGAN:  Well, obviously it's yes.

24    THE COURT:  Okay.  Why do you say so?

25    **PLAINTIFFS' ARGUMENT**

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 3 of 33**

4

1    MR. LOGAN:  Okay.  The reason I gave you -- Miss, if

2   we can go ahead and focus a little bit better.  29 U.S.C.

3   203(r) and (s) are the sections that we're talking about.  Your

4   Honor, I've given --

5    THE CLERK:  I'm sorry to interrupt.  Mr. Logan, if

6   you -- I'll need you to put the lapel mike on if you're going

7   to stand away from the mike.

8    MR. LOGAN:  Where's the lapel mike?

9    THE CLERK:  It's right at the front of the podium.

10    MR. LOGAN:  Oh -- oh, there it is.

11    THE COURT:  Okay.

12    (Pause)

13    MR. LOGAN:  There we go.  Sorry.

14    THE COURT:  Okay.

15    THE CLERK:  Much better.  Thank you.

16    MR. LOGAN:  I gave hard copies of this to the Court

17   and also to your Clerk so if that's helpful.  Oh, and then you

18   even have the statute.

19    THE COURT:  I have the book.

20    MR. LOGAN:  Ah, hey.  How can I get past that?

21   (Indiscernible) talked about enterprise liability, and what

22   they're saying is that under certain circumstances, a business

23   such as this is obligated to pay overtime.

24    Now, the last time we came before you with respect to

25   a motion for summary judgment, it had to do with mental illness

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 4 of 33**

1    and a somewhat tight reading of that term.  You decided that

2    there were questions in fact had to be decided before we'd be

3    able to go ahead and decide the issue.  However, mental illness

4    is a subset of a larger group of behaviors known as sick.

5              THE COURT:  'Kay.

6              MR. LOGAN:  Now, the Department of Labor has

7    promulgated a handbook called the Field Operations Handbook.

8    Department of Labor does enforcement of the Fair Labor

9    Standards Act, and this book -- or this -- I think it is a book

10   format, but the -- it's a fair -- as the handbook says that

11   sick here means infirm or the like.  The trigger is going to be

12   infirm.  The exact language which I had marked (indiscernible -

13   background noise) a second ago is:  "A physical or mental

14   infirmity or sickness of any kind."  As good as we can find,

15   nobody has addressed this issue in this -- in any jurisdiction.

16   But again, I repeat, "a physical or mental infirmity or

17   sickness of any kind."  I shorthand that by calling it

18   infirmity.

19              This interpretation by the Department of Labor is

20   made for the sole purpose of enforcing the rules by their

21   enforcement personnel.  As I said, mentally ill is a subset, if

22   we're going to accept the limited version of what mentally ill

23   says, of infirmity; however, it's a part of a larger set and an

24   overlapping one.  Somebody can be mentally ill and still have a

25   mental infirmity without being mentally ill and falling within

NoDak Rose Transcripts
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

Exh. 1
Page 5 of 33

6

1    the definition that's being promulgated by Youth Services.

2          Everything that we've gotten from them, not from us,

3    agrees with that interpretation.  There's nothing in Section

4    203 to disagree; sick, infirm, there's no disagreement there.

5    The Department of Labor's Field Operation Handbook, as I

6    indicated, says infirmity means mental infirmity or sickness of

7    any kind.  The common usage, which we talked about in the

8    briefing, talks once again about mental or physical infirmity.

9    That was the Webster's citation.

10          Now, let's take a look at client profile of who gets

11    into the Fairbank -- or the therapeutic family home, and I

12    boiled it down so we can just take a look for a second here.

13    All children admitted to the program will require stabilization

14    for mental illness and/or behavioral disorders -- this was part

15    of the 2004 hand -- or 2004 description, and I know of no

16    reason and they've presented no reason why it's no longer in

17    effect or that they're doing anything different -- or they're

18    suffering from a mental illness, or they need imminent

19    placement in a mental health facility, or they'll benefit from

20    stabilization and reduction or resolution of their mental

21    illness by being in the therapeutic family home.  In other

22    words, they're infirm.

23          Who doesn't get in to the therapeutic family home?

24    Who doesn't count?  Generally, they will not admit somebody

25    that simply requires temporary foster care, but who does not

**Exh. 1**
**Page 6 of 33**

7

1    require stabilization or treatment of a mental illness.

2    They're sick.  They're at least sick if we use a broad

3    interpretation which is what we're supposed to use rather than

4    a limited interpretation which is what they've been suggesting

5    we use.

6            Now, Mr. Regitano, who's had quite a bit to say to us

7    about why these children are not mentally ill, in fact he's

8    said many things about that.  Let me see if I can get this

9    right.  He says that the children are experiencing emotional or

10   behavioral problems and are at risk of placement in

11   institutional facilities.  Mr. Regitano says Medicaid pays for

12   services.  Medicaid pays for medical treatment.  It doesn't pay

13   for foster care.  Medicaid -- or the primary purpose of the

14   family homes is an alternative for children at risk of being

15   institutionalized.  Mr. Regitano said these children have

16   emotional and behavioral problems severe enough to make

17   institutionalization a risk.

18           Mr. Regitano said the children admitted to the family

19   home received clinical in-takes, functional assessments, and

20   evaluation by a mental health clinician.  We could go into why

21   we use mental health clinicians instead of psychiatrists,

22   psychologists or physicians, but it might have a lot to do with

23   the fact that in 1966, we didn't have very many master degreed

24   mental health clinicians and had -- if Congress thought about

25   it, they probably would have included it.

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota   58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 7 of 33**

8

1        However, if we go ahead, we accept this tight -- this

2   definition, we're still working with a mental health clinician

3   who's evaluating, assessing these children and creating a

4   diagnosis out of the -- under the rule that they have created.

5   They give them group therapy, they give them individual

6   therapy.  The therapy's conducted by a clinician, not by a

7   psychiatrist, a psychologist or physician, but Mr. Regitano

8   says that a clinician can do this.  That's certainly not

9   something you do for somebody who's not at least a little bit

10  sick or infirm.

11        He admits that there's a limited amount of therapy.

12  Mr. Regitano also says that master's level clinicians are what

13  he used at the family home -- or the family homes.  The Youth

14  Services also has a contracted psychiatrist and at least some

15  of the kids receive medication.  The children are evaluated by

16  a mental health clinician and provided with a diagnosis.

17        If I'm repeating myself a bit, it's because so did

18  Mr. Regitano.  A moment, Your Honor.

19                          (Pause)

20  Thank you.

21        Common diagnoses:  Attention deficit disorder,

22  depressive disorder, reaction -- reactive detachment disorder,

23  post-traumatic stress disorder, anxiety disorder, and a list

24  that if I recall correctly was about two inches long.  Mr.

25  Regitano said that the children have emotional and/or

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 8 of 33**

9

1   behavioral problems.  He acknowledged that the children

2   admitted to the therapeutic family homes need a stable and

3   supportive residence, and have behavioral problems which if not

4   addressed, could ultimately develop into serious mental illness

5   and require institutionalization.

6        Mr. Regitano said that children with severe mental

7   illness would not be admitted to the therapeutic family homes.

8   We will talk about what severe emotional disturbance means

9   later, but I'm not quite sure that I see a big difference

10  between severe mental illness and severe mental -- and severe

11  emotional disturbance.

12       Mr. Regitano said that they all have an axis one

13  diagnosis, and I believe that an axis one diagnosis is actually

14  required if they're going to go ahead and get medicated.

15       We mentioned in the briefs that new hires are asked

16  how they're going to hand -- what problems they think that they

17  might have dealing with severely emotionally disturbed

18  children.  Not foster kids that need a place to sleep, not

19  foster kids who don't have a good home to go to, but severely

20  emotionally disturbed children.  If they don't qualify as

21  mentally ill, they're certainly ill or infirm.

22       Their policy and procedures manual -- let's see if I

23  get it right.  Their client profile policies in their policies

24  and procedures manual says that children admitted to the

25  program will require stabilization for actions that are as a

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 9 of 33**

1  result of mental illness and/or behavioral disorders.  Their

2  client profile says:

3          "The children will have been determined through

4          clinical assessment to be suffering from a mental

5          illness not of an organic origin."

6  I might mention that I think the language has changed a little

7  bit ever since -- since about four years ago when they

8  discovered (indiscernible) is what I think really happened.

9  But this is what they originally said.  There's been no

10  evidence to show that there's any difference in what really

11  happens in the world.

12          The policies and procedures manual says that these

13  kids are in imminent need of placement in a mental health

14  treatment facility, and it says that they've been determined by

15  the therapeutic family home admission review that placement

16  would be beneficial to stabilization or reduction or resolution

17  of their mental illness.  As I indicated, they will not be

18  admitted if they do not require stabilization or treatment due

19  to mental illness.  Those kids who are not in need of

20  stabilization or treatment because they have some kind of

21  mental illness are not admitted to the therapeutic family

22  homes.

23          Now, if we use the Youth Services definition, it says

24  you need a psychiatrist, a psychologist, or a physician.  Then

25  we step outside of this box called infirmity and there's a

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**

**Page 10 of 33**

1   question of fact.  But you don't need to step out there to

2   realize that they're sick, they're infirm, they're ill, and

3   that part of the box allows you -- in fact, requires that you

4   find that they have -- that they qualify under 203 and they

5   need to be paying these people overtime.  There is no really --

6   there's no other reasonable interpretation.

7           Now, there's a couple of other issues that I need to

8   address, but I need to say it one last time because I'm not

9   capable of saying things only once --

10          THE COURT:  See, the beauty of this is right now,

11  believe it or not, my law clerk is listening to every word

12  you're speaking from her office in Anchorage, and I'm going to

13  be able to listen to this many times over --

14          MR. LOGAN:  I'm absolutely certain --

15          THE COURT:  -- through the miracles of modern

16  technology.

17          MR. LOGAN:  Right.  And through the miracles of the

18  fact that I never can keep my mouth shut.

19          THE COURT:  Well, okay.

20          MR. LOGAN:  Bottom line, these kids are ill, they are

21  infirm as defined by a Field Operation Handbook which was

22  promulgated by the Department of Labor for enforcement

23  purposes.  There's no other reasonable answer -- at least if

24  there is, I certainly don't understand it.

25          Now, I have to touch on a few things -- as soon as I

**NoDak Rose Transcripts**
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

**Exh. 1**
**Page 11 of 33**

12

1    can read my writing.

2              In their opposition at page four, they quoted the

3    Field Operation Handbook, 12G02, and they gave you a little

4    title, but they ignored the language about infirmity of any

5    kind.  They talked about Medicaid, giving us some definitions.

6    One of the interesting things in the definition is that you

7    determine what this program is by its overall character, not by

8    some very technical way of going about it, but by its overall

9    character.  That's what Medicaid says.  It's their cite.  It

10    also seems to me like common sense.

11              <u>Kitchings</u>.  Boy, we hear about <u>Kitchings</u> and we hear

12    about <u>Kitchings</u>, we hear about <u>Kitchings</u>.  <u>Kitchings</u> is a

13    district court case in Florida.  However, it's got some

14    interest, and one of the things is that <u>Kitchings</u> said that

15    they don't treat severely mentally ill children.  What in the

16    world is severely emotionally disturbed other than severely

17    mentally ill?  Maybe not by definition of psychiatrists or

18    psychologists or a physician, but they're severely emotionally

19    whatever you want to put at the end of it, illness,

20    disturbance, infirmity.  It's severe and it's emotional.  So,

21    <u>Kitchings</u> is halfway there for us.

22              All of the evidence equals infirmity, and all of that

23    infirmity is being treated by a very useful and very important

24    program in Fairbanks.  I don't want to see them close their

25    doors, but there has to be a way to compensate these people at

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 12 of 33**

13

1  the same time as following the law.  We think that that means

2  there would be less turnover.  And, you know, for these

3  children, every single time there's a new parent, there's a new

4  abandonment, there's a new change in who their role model is.

5  We think that if they can work out a way that the Fair Labor

6  Standards Act was meant to work out, they're going to keep

7  their help, and that's better for the kids.

8           If they were as creative in finding a way to pay

9  these people within the Fair Labor Standards Act as they are in

10 trying to get out of it, I don't think we'd be here and I think

11 they'd have a better program.

12          In any case, they had to send us the eleventh hour --

13          THE COURT:  Well, I want to give Mr. Wallace a chance

14 to speak, too, and -- you know, and you've used already going

15 on twenty-five minutes, so finish your -- your thought.

16          MR. LOGAN:  I think maybe I better just keep my

17 thought.

18          THE COURT:  Okay.  I just want to make sure we get

19 equal time.  You know, I remember years ago I was trying to

20 convince Judge Van Hoomissen of something, and I finally had to

21 graph it out for him and he understood it.  So, I'm trying to

22 graph out in my mind this whole thing.  I understand that 1938

23 Congress -- that's over seventy years ago, Congress enacted the

24 Fair Labor Standards Act, which required certain employees

25 involved in interstate commerce to pay -- certain employers in

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 13 of 33**

14

1   interstate commerce to pay its employees overtime.  And what

2   we're doing here today is trying to determine out -- determine

3   whether Family Centered Services of Alaska falls within the

4   category of those employees.  And so I'm trying to chase down

5   exactly how we get here.

6          You've moved way down to -- the dispute between you

7   two gentlemen is way down the list, and that is whether or not

8   -- and that's what you've been talking about today.

9          MR. LOGAN:  I can take you there.

10         THE COURT:  Well, I think I've pretty well gotten

11  there, but if you can take me there in a minute, that' would be

12  helpful.

13         MR. LOGAN:  I'll take you in ten.  In 1966, Congress

14  changed that law some, and what they said was if you're engaged

15  in certain be -- in certain activities, then you will have what

16  is known as enterprise -- enterprise liability, enterprise --

17  instead of being interstate commerce, we're going to define

18  this as this enterprise does meet interstate commerce.

19         THE COURT:  Okay.  All right.

20         MR. LOGAN:  Okay?  And in order to get there, you

21  have to file within these categories of people.

22         THE COURT:  And that's what we've got here.

23         MR. LOGAN:  And that's what we get for now.  It's

24  simple enough.  It didn't exist between nine -- in 1965, we

25  could not (indiscernible).  In 1966, we were included unless it

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 14 of 33**

15

1  means something completely different than the way it was

2  written.  Does that get you there?

3              THE COURT:  That gets me there.

4              MR. LOGAN:  Thank you, Your Honor.

5              THE COURT:  All right.  You'll have a chance to

6  respond --

7              MR. LOGAN:  Nothing further from me until --

8              THE COURT:  -- but I -- I think Mr. Wallace came all

9  the way over here.  You wanted to speak, right?

10             MR. WALLACE:  Your Honor, I don't care to speak.  Ms.

11 Ringstad's going to argue on our behalf.  Thank you.

12             THE COURT:  Oh, okay.  All right.  Very well.  Okay.

13             MR. LOGAN:  Thank you, Your Honor.

14             THE COURT:  All right.

15             MR. LOGAN:  Sorry.

16                        **DEFENDANTS' ARGUMENT**

17             MS. RINGSTAD:  Your Honor, in preparing for this

18 hearing, I did do some extra research just a couple days ago,

19 and I did find a case that hadn't been cited before.  I filed

20 this supplemental citations --

21             THE COURT:  Mm-hmm (affirmative).

22             MS. RINGSTAD:  -- and the case did talk about the

23 1966 amendment, and basically it said that --

24             THE COURT:  Is that the supplemental authority you

25 filed?  Is that --

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 15 of 33**

1    MS. RINGSTAD:  The case was, yeah.

2    THE COURT:  Okay.

3    MS. RINGSTAD:  It's <u>Jacobs v. New York Family</u>

4  <u>Hospital</u>, and it did involve a family home, but they were

5  trying to be brought within coverage on the basis they were

6  associated with a state agency, which is a different activity

7  that we're bringing within, but the same -- same subsections,

8  203(r) and (s).  And what the court said is that the extension

9  of coverage was intended to be narrow instead of broad with

10  respect to these non-profit organizations, and the reason was

11  they -- they -- they had specified just a few activities that

12  would bring them within coverage because those were the

13  activities that accompanied the businesses.

14    THE COURT:  Okay.  What case are you citing now?

15    MS. RINGSTAD:  It's <u>Jacob v. New York Family</u>

16  <u>Hospital</u> --

17    THE COURT:  Okay.

18    MS. RINGSTAD:  -- 483 F. Supp. --

19    THE COURT:  Okay.

20    MS. RINGSTAD:  -- 251.  If you have the supplemental

21  citations, it's on the second page.

22    THE COURT:  I have it right in my -- front of me.

23    MS. RINGSTAD:  Yeah.  And that is the only case I

24  have been able to find talking about that (indiscernible)

25  history of those amendments.

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 16 of 33**

1      THE COURT:  'Kay.

2      MS. RINGSTAD:  Okay.  Family Centered Services

3  operate their family homes as residential child care

4  facilities; that's how they're licensed.  They provide a home

5  for children that have emotional and behavior problems.

6  Another key element is that they have no safe and stable home

7  or foster home.  These children have no home that can help them

8  deal with their problems; therefore, they have the family homes

9  with the therapeutic (indiscernible) parents that are supposed

10  to be modeling (indiscernible) behavior and helping them shape

11  the behavior and then control their emotions and their life

12  skills.

13      Another key factor that they not be suffering from a

14  serious mental illness because they're not equipped to handle

15  children with severe mental illnesses.  And if the children are

16  seriously ill, they will not be admitted to the home, they're

17  moved and placed in an institution.

18      The fourth thing that they don't require

19  institutional -- institutionalization or restricted

20  environment.  These kids -- the homes are set up like private

21  homes, the kids attend public school, they ride the school

22  buses, they attend after-school activities and community

23  events.  Their (indiscernible) involves new life skills,

24  attending school, educational support, community activities.

25  The therapy they -- they receive is very limited.  They meet

NoDak Rose Transcripts
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

Exh. 1
Page 17 of 33

18

1   twice a week for two hours each time, so two hours a week, in a

2   group with the other members of the home so the kids can

3   discuss their living arrangements, and they receive one hour of

4   therapy -- individual therapy each week.  That's all the

5   therapy they receive.

6        They are not admitted to a home based on any kind of

7   a thorough -- or evaluation by psychiatrists or psychologists

8   or a physician.  They are evaluated by clinicians after they're

9   admitted, and the clinicians are basically licensed -- they

10  licensed social workers.  They see a psychiatrist only if their

11  medication is (indiscernible) for any kind of treatments.

12       Now, under the Fair Labor Standards Act, non-profits

13  are covered only if they are engaged in the care of the sick,

14  the aged, the mentally ill, or defective.  There is no

15  indication that Congress listed those with the intent of

16  including mental illness as a subset of the sick.  Those are

17  listed separately.  And I believe the common sense definition

18  of sickness would be physical sickness, especially where they

19  separately listed mental illness.

20       If they intended for children with emotional

21  disturbances that were not serious enough to constitute a

22  mental illness to be included, they would have separately

23  listed emotional disturbed children as within coverage.

24       Now, the Department of Labor's Field Operation

25  Handbook -- I cited some cases yesterday in the supplemental

**NoDak Rose Transcripts**
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

**Exh. 1**
**Page 18 of 33**

1   citations -- is not entitled to the kind of deference that is

2   given to agency regulations.  It's simply a handbook to help

3   their employees that enforce the laws, and this Court may

4   decide it's persuasive or not persuasive.

5           The provisions in the handbook addressing children

6   provide that there is no coverage for a non-profit caring for

7   neglected independent children unless it is a hospital, covered

8   institution, or school.

9           The provision addressing emotional -- persons with

10  emotional disturbances requires that more than fifty percent of

11  the residents be admitted or evaluated by a physician,

12  psychiatrist or psychologist.  In this case, the kids were not

13  evaluated or admitted by a physician, psychiatrist, and

14  psychologist, indicating that the conditions were not serious

15  enough -- the conditions were not serious enough to require

16  admission or evaluation by a physician, psychiatrist, or

17  psychologist.  The conditions did not constitute mental

18  illness, sickness, or defective under coverage in the Field

19  Operations Handbook.

20          I think that test is basically to sort out emotional

21  disturbances instead of serious -- having emotional

22  disturbances that are not serious.  In this case, they were not

23  serious enough to require admission or evaluation by a

24  psychiatrist, psychologist, or physician.

25          Now the section that they rely on in the handbook is

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota   58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 19 of 33**

20

1  12G02, where there is some (indiscernible) language, but that

2  is not a section that's defining sickness or mental illness.

3  It doesn't define sickness as including any infirmity, and it

4  doesn't negate the requirement that the residents must be the

5  sick, the aged, or the mentally ill or defective.

6        The focus must be on whether residents are the sick,

7  the aged, or (indiscernible) defective.  And in the case --

8  (indiscernible) cases was <u>Kitchings</u> and <u>Bowen</u> (ph):

9        "Coverage did not extend to children who were

10        residing in family homes with house parents, went to

11        the public schools, and who received limited

12        therapy."

13  In the <u>Bowen</u> case, the court distinguished between there are

14  homes -- where the children resided in homes, attended school,

15  and did receive limited therapy from their homes that were said

16  to (indiscernible) serious mental illnesses.  It was only the

17  later homes that dealt with children with serious mental

18  illnesses that were covered by the act.

19        And the court distinctly said that the

20  (indiscernible) -- described as created specifically addressing

21  children with severe mental health and not behavioral health

22  commissions.  The program employed psychiatrists,

23  psychologists, social workers, and nurses to attend to the

24  residents' mental health needs, none of which is in --

25  (indiscernible) in the family homes.  And by the home's own

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 20 of 33**

21

 1   admission, fifty to seventy-five percent of its residents

 2   suffered from a severe mental illness.

 3        The court considered the nature of the population,

 4   the type of the care provided by the home, and that -- the

 5   factors for admission.  And the state found this consistent

 6   with the department (indiscernible) approach, looking at the

 7   nature and the amount of services provided by the non-profits.

 8   And looking at the services provided here, I don't believe any

 9   of those services would be the type of services that would be

10   treating the mentally ill.

11        And the plaintiffs have the burden of proving that

12   Family Centered Services fell within 203(r) and (s).  And in

13   the absence of any evidence that the children were mentally ill

14   or physically sick, they should not be granted summary

15   judgment.  In fact, summary judgment should be granted in favor

16   of Family Centered Services.

17        THE COURT:  Okay.  So you want -- you want summary

18   judgment in your favor.

19        MS. RINGSTAD:  I think -- I think that -- yes.

20        THE COURT:  Okay.  I'm not -- I don't mean okay, I

21   mean okay, it's Mr. Logan's turn.

22        MS. RINGSTAD:  Is there anything -- any questions?

23        THE COURT:  No, I -- I'm not going to make a decision

24   today if that's what you think.  I'm still working on this.

25   I've got books -- you know, I've got law clerks searching --

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 21 of 33**

22

1    this is not something we deal with every day.

2                           (Pause)

3    Why don't they just make it clear so that I don't have to spend

4    all this time wading through these things and trying to figure

5    out what someone else meant forty years ago?

6              MR. LOGAN:  Because they did it twenty years ago --

7              THE COURT:  Okay.

8              MR. LOGAN:  -- and because it's Congress.

9              THE COURT:  Okay.

10                 **PLAINTIFFS' REBUTTAL ARGUMENT**

11             MR. LOGAN:  I'm going from memory.  I believe that I

12   am correct, but this will be something that -- that somebody's

13   going to have to look up.  My memory, compared -- combined with

14   somebody who helped me work on it, says that the reason that

15   they added -- they added these -- this scope of enterprise --

16             THE COURT:  Mm-hmm (affirmative).

17             MR. LOGAN:  -- in 1966 was to add to non -- to the

18   hospital model, non-profits.  Prior to that time, the non-

19   profits were not there.  That's your recollection.  Okay.

20   That's two recollections.  It doesn't mean it's right, but it's

21   better than one recollection.  Okay.

22             Family Centered Youth Services goes back and re-

23   argues mentally ill as being this tight idea that you have to

24   have psychiatrists, psychologists, and physicians.  We briefed

25   it to death and I'm not going to do it again.  We just think

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 22 of 33**

23

1   they're wrong.  I mean, no, they could be right.  If they're

2   right, they're still not going to get out of this because this

3   is an overlapping part of the set, and if I had been able to

4   figure out how to do VIN (ph) diagrams at three o'clock this

5   morning, you'd have one, okay?

6           THE COURT:  That's all right.

7           MR. LOGAN:  But I couldn't figure out how to get the

8   computer to do it.  Let's talk about what the Field Operation

9   Handbook says just for a second.

10           THE COURT:  Okay.  I'm going to give you seven

11   minutes and Ms. Ringstad seven minutes --

12           MR. LOGAN:  Okay.  Thank you.

13           THE COURT:  -- so everybody's -- fair time.

14           MR. LOGAN:  Gotcha.  Which says "suffering from

15   physical or mental infirmity or sickness of any kind."  That's

16   very clear, the inter -- of any kind sort of gets me there.

17           THE COURT:  They say that's not -- not authoritative

18   though.

19           MR. LOGAN:  Well, she says it's not authority,

20   however, let's see why she says that.  She says it's not

21   authority because she's saying, you know, handbooks aren't, and

22   she cites to a case called <u>Brennan</u>.  In <u>Brennan</u> -- <u>Brennan</u>

23   talked about handbook with con -- consideration officers.  I've

24   never really even heard of them, but apparently they have their

25   own handbook.  And it said -- you look at it and you decide

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 23 of 33**

1  whether or not it fits within the whole picture and give it the

2  weight its worth.

3        However, <u>Brennan</u> -- which by the way was in another

4  jurisdiction -- in 1974 also said this.  It says:

5            "Courts would also lack prudence to dictate to the

6            Secretary exactly how to perform his duties which are

7            expressly within the expertise of the Secretary of

8            this Department."

9  So, whether it's binding on (indiscernible) or I think it's a

10 line of cases that starts with a case called <u>Skidmore</u>.  You're

11 supposed to take a real close look at it and would lack

12 prudence just to go ahead and ignore it.  They meant something.

13        And this is -- the other -- let me point out one

14 other thing.  They issued -- they mentioned another bunch of

15 cases.  Those cases are talking about the informal letter of

16 opinion that people ask for so they can keep out of trouble;

17 how they spin it, how they don't spin it, doesn't matter.  But

18 those cases, almost all of them talk about informal opinions --

19 opinion letters, and I believe that opinion letters really

20 aren't entitled to deference.

21        I think the rest are and I think that in the case of

22 an enforcement -- an enforcement handbook written by the people

23 that are doing the enforcement were there.  Now let's see what

24 we've got to do with it.  I tried -- quoted <u>Eyre</u> (ph) and it's

25 <u>Eyre</u>, and that's hard to get <u>Eyre</u> to --  there we go.

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 24 of 33**

25

1     <u>Eyre</u> says two things that are important to you.  It

2  says that:

3          "The Fair Labor Standards Act grants the Secretary

4          broad authority to define and delimit the scope of

5          the exemption for executive, administrative, and

6          professional employees."

7  It's the same -- it's the same deal.  We're talking about the

8  fair -- the Secretary administering their own law.  That's at

9  519 U.S. at 452, and I believe the page number -- well, it's in

10  there.  Sorry.

11       Now, here's what's important because Congress has not

12  directly spoken to the precise question at issue.  We must

13  sustain the Secretary's approach so long as it is based on a

14  permissible construction of the statute, and then they cite to

15  <u>Chevron</u>.  This was a Ninth Circuit case in 1997 -- the briefs

16  are in there, but it's 519 U.S. at 452, and I'll leave it to

17  your law clerks to do the rest on them.

18       What they're saying here is that these kids aren't

19  sick enough to be called sick, they're not infirm, and that the

20  Field Operation Handbook should just be ignored.  That's what

21  they're telling you to do, ignore it.  Well, you shouldn't

22  ignore it.  You should at least give it what it's due at the

23  very least, and since nobody else has said anything about it

24  and since all of their information and their own testimony says

25  there's something wrong with these kids, they can be helped by

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 25 of 33**

26

1  these homes.  These children are sick and they should be paying

2  their help at the therapeutic family homes overtime as required

3  by the statute.  Is there anything else I can answer?

4         THE COURT:  No.  I'm just -- I'm thinking about on

5  the one hand, you've got a good policy (indiscernible) pay

6  employees fairly.  On the other hand, you've got a good policy

7  that you want to encourage these very good institutions to keep

8  going.  You don't want to -- you don't want to run them --

9  financially run them out of business, but you want to pay the

10  employees fairly, so --

11        MR. LOGAN:  If they're going to tell you that they're

12  going to go out of business --

13        THE COURT:  I don't know.  I'm just -- I'm just think

14  -- no one's telling me anything.  I'm just kind of thinking

15  about this whole thing.

16        MR. LOGAN:  Right.  Right.  I know you're thinking

17  that, but it's up to them to give you some evidence that says

18  they're not going to be able to do it, and they haven't done

19  that.

20        THE COURT:  No, I just -- okay.

21        MR. LOGAN:  They haven't given you any evidence or

22  made the allegation that we can't economically do this.  All

23  they're saying is it may be -- we'll have to give them more

24  money.

25        THE COURT:  How come this -- this has not been

NoDak Rose Transcripts
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

Exh. 1
Page 26 of 33

1  litigated before?  You'd think that there would be all kinds of

2  cases on this.

3           MR. LOGAN:  You know, that's what I was wondering.

4  This particular issue nobody's thought of, I suppose, or

5  nobody's ever gone past the mentally ill section.  There's only

6  one case and that was down in Florida until recently --

7           THE COURT:  Right.

8           MR. LOGAN:  -- when that one was decided.  That's it.

9           THE COURT:  I see that.

10          MR. LOGAN:  So, you're making new law, Your Honor.

11          THE COURT:  Ms. Ringstad, what do you have to say?

12          MR. LOGAN:  Thank you very much.

13          THE COURT:  Thank you.

14                    **DEFENDANTS' REBUTTAL ARGUMENT**

15          MS. RINGSTAD:  Well, there are several Department of

16  Law -- Labor letters that were issued to non-profits, and most

17  of those indicate that there's no coverage.  Some of them

18  qualify saying unless you're operating a hospital, a school, or

19  an institution.

20          THE COURT:  So, how would -- what would generate a

21  letter like this?  Why would --

22          MS. RINGSTAD:  I think a non-profit writes in say

23  would you consider this --

24          THE COURT:  Would you please tell us if -- is that

25  what you're saying?  Someone writes the Department of Labor and

**NoDak Rose Transcripts**
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

**Exh. 1**
**Page 27 of 33**

1    asks for an opinion?

2              MS. RINGSTAD:  I think they ask their opinion.

3              THE COURT:  Okay.

4              MS. RINGSTAD:  I mean, I -- I did attach a -- one I

5    just found --

6              THE COURT:  Mm-hmm (affirmative).

7              MS. RINGSTAD:  -- to the supplemental citations.

8              THE COURT:  Mm-hmm (affirmative).

9              MS. RINGSTAD:  You know, I don't think, you know, the

10   -- the non-profit asks or writes to them in some fashion, you

11   know, will we be covered?  You don't say on the basis of mental

12   illness.  And I don't think that was -- the Department of Labor

13   has ever interpreted they're in this type of a family home in

14   the coverage on a basis that, well, if the kids aren't really

15   ill, then they must be sick in some fashion.  I don't think

16   it's ever been -- that that section's ever been interpreted in

17   that manner, and that's why there's no cases on the -- on the

18   basis of sickness, and all -- the basis that it's been argued

19   is on the basis of mental illness and the distinguishing

20   factors and the type of treatment whether these -- the home was

21   provided -- was treating the mentally ill (indiscernible)

22   services that would cause it to do treatment of the mentally

23   ill.

24             And we know our therapy, I don't think the con -- was

25   -- amounts to that in all of these cases had kids that had

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 28 of 33**

1    diagnoses and that we would see you in therapy.  These are kids

2    without homes, so I would think in almost all cases, there

3    would be -- you would see some sort of diagnosis and some

4    therapy.

5           And we haven't asked the Court to ignore the handbook

6    that is not binding.  I listed some cases, but there are a lot

7    of cases say it's not binding authority.  This Court is free to

8    determine how persuasive the provisions are.

9           And the particular provision to beam the light on to

10   bring in the infirmity language -- as I said, is it defining

11   the term sick or mentally ill as any infirmity?  It's -- they

12   did a test determining whether the institution was primarily

13   engaged in the sick -- the sick.  And if you notice the clause

14   that talks about physical inter -- physical and mental

15   infirmity or sickness of any kind, is the clause such that --

16   with if.  So in this case, unless the kids were either sick or

17   mentally ill or defective, we wouldn't be in this at all.

18          The aged -- it might mean something if you're talking

19   about the aged, that they would be in the home and might not be

20   suffering from any kind of sickness, but otherwise necessarily

21   they would be.  So, I'm not sure this provision, especially the

22   way it's being interpreted, makes any sense to me at all.

23          THE COURT:  Well, I -- the word aged I presume means

24   old --

25          MS. RINGSTAD:  Yeah.

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 29 of 33**

1          THE COURT:  -- it doesn't mean old or very young, or

2    does it?  I don't know.  I'd have to look that up.  Aged,

3    aged [pronounced age-ed].

4          MS. RINGSTAD:  Aged.  I --

5          THE COURT:  I always thought it meant very old --

6          MS. RINGSTAD:  I think --

7          THE COURT:  -- but I haven't explored it.

8          MS. RINGSTAD:  -- in everything I've seen, it was

9    referring to people that were old and in need of care.

10          THE COURT:  Right.

11          MR. WALLACE:  Don't give Mr. Logan any ideas.

12          THE COURT:  No, I just was --

13          MS. RINGSTAD:  And the term sick refers to

14    specifically sick.  And if you look at (indiscernible) --

15          THE COURT:  That's your opinion, but he doesn't think

16    so.

17          MS. RINGSTAD:  Well, I don't think they would --

18          THE COURT:  Yeah.

19          MS. RINGSTAD:  -- list the broad and then go down the

20    subsets where they're saying the sick, the aged, the mentally

21    ill, or defective, and it's the mentally ill or defective.  I

22    think the mentally means mental -- the mentally ill or mentally

23    defective, and there's a provision that does define the

24    mentally defective as of certain I.Q.  It's just not that

25    you're a defective person.

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 30 of 33**

31

1      THE COURT:  There's not -- I suppose there's not

2  legislative history on this exact point, is there?  No one's

3  given me any specific --

4      MS. RINGSTAD:  On whether or not --

5      THE COURT:  How you define these words.  Sometimes a

6  congressman stands up or senator at a hearing and says, well,

7  make sure we understand, but that --

8      MS. RINGSTAD:  You know, there was in 1966, and at

9  that time, institutions were probably referred to as

10  institutions, not as homes, and diagnoses I think are much more

11  common that are much broader (indiscernible) all these

12  emotional disturbances that may be -- attention deficiencies, I

13  don't know how many of those even existed in 1966.  So, I don't

14  know if they felt the need to really define the mental illness.

15      If you look at the state statute that talks about

16  mental illness, it's:

17          "A mental or emotional impairment that has a

18          substantial adverse effect on an individual's ability

19          to exercise conscious control and the individual's

20          actions or ability to perceive reality or delusion or

21          to understand."

22  And that is how the state defines mental illness.

23      These kids don't even qualify -- none of these kids

24  would qualify under that definition of mental illness.  These

25  kids -- most of the kids don't even qualify for services

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1054*

**Exh. 1**
**Page 31 of 33**

32

1  provided by the school district.

2          THE COURT:  Okay.  You've given me a lot to think

3  about.  Do I have a verdict by any chance?

4          THE CLERK:  No.

5          THE COURT:  Oh.  Okay.  Anyone else -- any final

6  words?

7          MR. LOGAN:  You don't really want to do that to me,

8  do you?

9          THE COURT:  No, I don't.

10          MR. LOGAN:  I mean, I've got a couple, but --

11          THE COURT:  No, I -- I -- and it's been thoroughly

12  briefed and -- and I've read all this stuff before I came up.

13  I've still got to do some more thinking, but my law clerk is

14  listening, too, and I'm sure she's got the answer just as --

15  just like that.

16          MR. LOGAN:  Don't they always?

17          THE COURT:  Yeah.  Okay.  Have a great warm

18  afternoon.  We'll talk to you later.

19          MR. WALLACE:  Thank you very much, Your Honor.

20          MR. LOGAN:  Thank you, Judge Beistline, and Happy New

21  Year.

22          THE COURT:  All right.

23          THE CLERK:  All rise.  This matter is now adjourned.

24  Court stands in recess until 1:30.

25      (Proceedings concluded at 11:47 a.m.)

**Exh. 1**
**Page 32 of 33**

1

## CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
3    entitled matter.

4
     /s/ D. Kathleen Stegmiller                    08/29/09
5    D. Kathleen Stegmiller, Transcriber              Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NoDak Rose Transcripts
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

Exh. 1
Page 33 of 33